**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| WILLIAM REILLY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY[1], | : | No. 21-02710 |
| Commissioner of Social Security | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**PAMELA A. CARLOS**
**U.S. MAGISTRATE JUDGE**                                        **January 25, 2024**

Plaintiff William Reilly ("Plaintiff" or "Mr. Reilly") seeks reversal of a limited portion of the final decision of the Commissioner of Social Security denying Plaintiff's application for a Period of Disability and Social Security Disability Insurance Benefits ("DIB"). He first contends that the Administrative Law Judge's ("ALJ") decision is constitutionally defective because the Commissioner under whom the ALJ issued the decision served a longer term than the President and was removable only "for cause," in violation of the separation of powers. On the merits, Mr. Reilly contends that the ALJ erroneously found that his disability ceased as of September 2, 2009 without the required evidence of "medical improvement" related to his ability to work. In this regard, Mr. Reilly insists that the evidence "must show" improvement in his symptoms, and that the ALJ failed to carry its burden as to this issue. The ALJ instead, according to Mr. Reilly, improperly relied on his "gap in treatment" between 2009 and 2012 to infer that there had been "medical improvement." Indeed, Mr. Reilly contends that the ALJ compounded this error further

---

[1]      Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is hereby substituted as the Defendant in this suit. No further action need be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

by relying on this gap in treatment when evaluating, and ultimately discounting, the medical opinions of Khwaya Mujib Haque, M.D. ("Dr. Haque"), F. Todd Wetzel, M.D. ("Dr. Wetzel"), and Steven J. Valentino, D.O. ("Dr. Valentino").[2]

The Commissioner disagrees, arguing that Mr. Reilly's sweeping constitutional claim must be rejected, and that the ALJ's analysis was appropriate under the governing regulations. Specifically, the Commissioner characterizes Mr. Reilly's substantive challenges as nothing more than a request of this Court to improperly reweigh the evidence. According to the Commissioner, the ALJ detailed the rationale for his finding of medical improvement by analyzing and citing to the medical evidence of record and that the ALJ properly inquired into Mr. Reilly's three-year treatment gap and found it was inconsistent with the severity of his allegations from that period. And because none of the three physicians noted above mentioned, let alone considered, this gap in treatment when issuing their opinions, the ALJ properly made clear that said opinions were only partially persuasive and the limitations noted therein were not credibly established by the evidence.

For the reasons that follow, I will affirm the Commissioner's decision and Mr. Reilly's request for review is denied.

I.      BACKGROUND

A.      Factual and Procedural History.

Mr. Reilly was born in February 1957 and was 54 years old as of his Date Last Insured—June 30, 2011 ("DLI"). R.124, 486. He graduated high school and had a history of past relevant work as a construction laborer. R.30, 513-15, 522.

---

[2]      Building upon these earlier errors, Mr. Reilly also argues that the ALJ failed to incorporate all of his credibly established limitations in the residual functional capacity ("RFC") determination because he failed to include those limitations offered by Dr. Haque, Dr. Wetzel, and Dr. Valentino.

Mr. Reilly protectively applied for DIB under Title II of the Social Security Act ("SSA" or "the Act") in May 2014, alleging a disability onset date of February 1, 2007 due to neck injury, high blood pressure, diabetes, degenerative disc disease and high cholesterol. R.124, 144, 410-20, 520. Mr. Reilly's application was initially denied on July 1, 2014, and he timely requested a hearing on August 6, 2014. R.201-02. On April 25, 2016, and represented by counsel, Mr. Reilly appeared and testified at a hearing before an ALJ, who ultimately granted his application on January 1, 2017.  R.100, 128. However, the Appeals Council reviewed the ALJ's decision on its own motion under 20 CFR § 404.969 and remanded the case for further proceedings. R.138.

Following the Appeals Council's order, a second hearing was held before the same ALJ on September 25, 2017 where Mr. Reilly, his counsel, and a vocational expert again appeared and testified. R.81. The ALJ found Mr. Reilly was disabled for a closed period between February 7, 2007 through September 1, 2009. R.148, 171. Mr. Reilly thereafter requested review by the Appeals Council who on August 30, 2019 vacated the latest decision and remanded the case for a new hearing before a different ALJ. R.166-70.

After this third hearing, the ALJ issued a decision on April 3, 2020 again finding that Mr. Reilly was disabled during a closed period, but this time from February 20, 2007 through September 1, 2009. R.21.[3] Again, Mr. Reilly requested review by the Appeals Council on May 15, 2020, which was ultimately denied on April 15, 2021 making the ALJ's decision the Commissioner's final decision. R.1-6, 407-09. Mr. Reilly now timely seeks judicial review of the ALJ's decision.[4]

---

[3]　　At this third hearing, Mr. Reilly amended his alleged onset date to February 20, 2007. R.47.

[4]　　The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C § 636(c). *See* ECF Doc. Nos. 4, 17

B.     ALJ's Decision.

The ALJ evaluated Mr. Reilly's claims using the five-step sequential analysis set forth in the Social Security regulations.[5] Beginning at step one, the ALJ determined that Mr. Reilly did not engage in substantial gainful activity since February 20, 2007, the date the claimant became disabled. R.25.

At step two, the ALJ found that Mr. Reilly suffered from the following severe impairments: Left Shoulder Impairment with status post repair of supraspinatus tear; Degenerative Disc Disease of Cervical Spine with Spondylosis and Fusion at C4-C6; History of Gout; Obesity. R.25 (citing 20 CFR § 404.1520(c)). The ALJ further found that these medically determinable impairments significantly limited Mr. Reilly's ability to perform basic work activities as required by SSR 85-28. R.25.

Moving on to step three, the ALJ concluded that none of Mr. Reilly impairments alone, or in combination, met or medically equaled the requirements of the impairments listed in the regulations. R.25-26 (citing 20 CFR §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ compared Mr. Reilly's impairments to Listings 1.02 (Major dysfunction of a joint(s) (due to any cause)) and 1.04 (Disorders of the Spine) and concluded that the objective evidence failed to indicate that Mr. Reilly had functional loss based on his musculoskeletal impairments or compromised nerve root or spinal cord damage. R.25. The ALJ further found that Mr. Reilly's BMI, which exceeded 30 and thus classified him as obese by the Centers for Disease Control, and

---

[5]    The sequential analysis requires the ALJ to evaluate (1) whether claimant's work, if any, qualifies as "substantial gainful activity"; (2) whether the claimant's medically determinable impairments are severe; (3) whether any of the claimant's impairments meet or equal the requirements for impairments listed in the regulations; (4) whether the claimant is able to perform "past relevant work" considering her residual functional capacity; and (5) whether the claimant can adjust to other work considering her residual functional capacity, age, education, and work experience. *Rivera v. Astrue*, 9 F. Supp. 3d 495, 499 (E.D. Pa. 2014) (citing 20 C.F.R. § 404.1520(a)(4)). The claimant has the burden of proof at steps one through four, and then at step five, the burden shifts to the Commissioner of Social Security. *Id.*

its associated effects on his body systems, failed to meet the criteria required by the Listing of Impairments for presumptive disability. R.26.

Before reaching step four, the ALJ considered Mr. Reilly's residual functional capacity ("RFC").[6] After reviewing the objective medical evidence and the opinion evidence in the record, the ALJ determined that between February 20, 2007 and September 1, 2009, Mr. Reilly:

> [H]ad the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)[7] except: lifting and carrying of 10-20 pounds; no reaching with left upper extremity; sitting 4 hours out of 8, standing 3 hours out of 8 and walking 2 hours out of 8 with alternating position every 30 minutes; no climbing; occasional foot controls, reaching, handling, fingering and feeing; and no climbing ladders or stairs, stooping or crouching.

R.26. Next, at step four, the ALJ found that given Mr. Reilly's RFC, he could not perform any past relevant work between February 20, 2007 and September 1, 2009. R.30. Specifically, the ALJ explained that the demands of Mr. Reilly's past work as a Construction Worker exceeded his sedentary RFC, and that Mr. Reilly's acquired jobs skills did not transfer to other occupations within his defined RFC. R.30.

The ALJ then proceeded to step five and concluded that between February 20, 2007 and September 1, 2009, there were no jobs that existed in significant numbers in the national economy that Mr. Reilly could have performed. R.31. As such, the ALJ found Mr. Reilly was "disabled" as that term is defined by the SSA during this timeframe. R.31 (citing 20 C.F.R. § 404.1520(g)).

However, the ALJ further found that medical improvement occurred as of September 2, 2009. R.31. Specifically, the ALJ explained that Mr. Reilly "followed up with his neurosurgeon

---

[6]    Residual functional capacity, or RFC, is defined as "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

[7]    The regulations define "sedentary work" as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* The regulations clarify that "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

on September 3, 2009, at which time he reported improvement in his symptoms." R.31. At no point

thereafter did Mr. Reilly seek any further treatment until a flare of gout in June 2012. R.31.

Although Mr. Reilly testified at the hearing that his second surgery in 2009 did not improve his

condition, the ALJ found that his statements "concerning the intensity, persistence and limiting

effects of [his] symptoms are not entirely consistent with the medical evidence in the record . . ."

R.32. For example, the ALJ cited to correspondence from Mr. Reilly's neurosurgeon dated

September 3, 2009, which indicated that he saw Mr. Reilly for a neurological follow-up after his

procedure, and that Mr. Reilly "reported that his pain leveled [sic] varied with the day and the

amount of intensity and activity, though he was neurologically intact on examination." R.32 (citing

Exhibit 18F).[8] Following a three-year gap in treatment, the ALJ also noted that a November 2012

MRI of Mr. Reilly's cervical spine "was notable for post-surgical changes without evidence of

complications." R.32. Finally, the ALJ found that there was no explanation for Mr. Reilly's gap in

treatment between September 2009 and 2012. R.33. As the ALJ explained, "[b]y his own

testimony, [Mr. Reilly] had access to health care through his wife's insurance and his $450,000

net workers compensation settlement." R.33.

Having found medical improvement, the ALJ further found that beginning on September

2, 2009, Mr. Reilly had the RFC to "perform light work[9] as defined in 20 CFR 404.1567(b) except

---

[8]     Earlier in the decision, the ALJ noted that Mr. Reilly "underwent a cervical decompression in April 2009," and that during his "six week follow up appointment in June 2009, [Mr. Reilly] was doing quite well." R.27 (citing Exhibits 18F and 35F). As explained by the ALJ, Mr. Reilly "had no cervical radiculopathy and was quite pleased with his results." R.27 (citing Exhibit 18F).

[9]     The regulations define "light work" as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The Social Security Administration has instructed that, "[t]o be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." *Id.* For example, "[i]f someone can do light work, [the Social Security Administration] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

that claimant can perform no more than routine, repetitive tasks." R.32. Although Mr. Reilly was unable to perform past relevant work, the ALJ found that given his RFC, age, education, and work experience, there were jobs that exist in significant numbers in the national economy that Mr. Reilly could perform. R.33 (citing 20 CFR §§ 404.1560(c) and 404.1566). As such, the ALJ concluded that Mr. Reilly's disability ended on September 2, 2009 and that he has not become disabled again since that date. R.34 (citing CFR 20 § 404.1594(f)(8)).

## II.   STANDARD OF REVIEW

Judicial review of a social security disability determination is "limited." *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005). The agency's factual findings are "conclusive," and therefore must be upheld, if they are supported by "substantial evidence." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing (42 U.S.C. § 405(g)). Substantial evidence is not a demanding standard. *Id.* at 1154. All it means is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1153 (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). This is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Rutherford*, 399 F.3d at 552 (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). When reviewing for substantial evidence, courts cannot "re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). But any legal conclusions are reviewed under a plenary standard. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 208 n.10 (3d Cir. 2019).

## III.   DISCUSSION

### A.   The ALJ's Decision Is Not Constitutionally Defective.

Mr. Reilly first asserts that the government deprived him of a valid administrative adjudicatory process based, in large part, on two recent Supreme Court cases where the Court

analyzed the constitutionality of a statute restricting the President's authority to remove singular heads of an executive agency. *See* ECF Doc. No. 10 at 7-8. at 7 (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *Collins v. Yellen*, 141 S. Ct. 1761 (2021)).  According to Mr. Reilly, "only the Commissioner of [the] SSA can make findings of fact and issue final decisions as to benefits eligibility," and in this instance, former Commissioner Andrew Saul ("Commissioner Saul") was improperly insulated from removal, thus rendering the entire agency's structure defective. *Id.* at 8 (citing 42 U.S.C § 405(b)(1) and 42 U.S.C. § 902). In other words, Mr. Reilly contends that the ALJ and the Appeals Council both lacked the authority to hear and decide his claims because said authority is a feature of—indeed, derived from—the authority granted to Commissioner Saul. *Id.* at 8. On this basis alone, Mr. Reilly argues that remand is required. *See* ECF Doc. No. 14 at 17.[10]

In response, the Commissioner concedes that "42 U.S.C § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." *See* ECF Doc. No. 11 at 5. Indeed, there is near universal agreement in this circuit that the Statute in question is flawed similarly to those in *Seila Law* and *Collins*, and thus, violates the separation of powers. *See Etze v. Kijakazi*, No. CV 22-32, 2023 WL 3689701, at *8 (E.D. Pa. May 26, 2023); *Rowe v. Kijakazi*, No. 3:21-CV-01511, 2023 WL 2742747, at *3 (M.D. Pa. Mar. 31, 2023); *Candusso v. Kijakazi*, No. 21-437, 622 F.Supp.3d 100, 2022 WL 3447306, at *3 (W.D. Pa. Aug. 17, 2022); *High v. Kijakazi*, 20-3528, 2022 WL 394750, at *6

---

[10]      In his opening brief, Mr. Reilly did not specifically request a remand, but instead argued that given the alleged constitutional defects in the SSA's overall structure, the ALJ's decision "should be reversed by this Court." *See* ECF Doc. No. 10 at 9. But of course, Mr. Reilly's present appeal only challenges a *limited* portion of the ALJ's decision— i.e., the ALJ's specific finding that his "disability" ceased as of September 2, 2009. Indeed, his appeal leaves undisturbed the ALJ's earlier findings that Mr. Reilly was disabled between February 20, 2007 and September 1, 2009. It is not immediately clear whether Mr. Reilly's sought after relief would necessarily require relitigating *all* aspects of the ALJ's decision, including those favorable to him. However, because the Court has rejected his constitutional challenge, it declines to address this broader issue.

(E.D. Pa. Feb. 9, 2022);  *Stamm v. Kijakazi*, 577 F.Supp.3d 358, 369 (M.D. Pa. 2021) (all finding that the Statute violated separation of powers). But "it does not follow that this unconstitutional removal restriction requires the court to set aside an unfavorable disability benefits determination by an ALJ."  *Rowe*, 2023 WL 2742747, at *3. The Supreme Court has made clear that "[r]elief is available in removal challenges only where officials subject to the challenged removal restrictions cause the alleged injuries, and where those restrictions themselves caused 'compensable harm' upon plaintiffs." *Stamm*, 577 F. Supp. at 368 (citing *Collins*, 141 S. Ct. at 1789).

Mr. Reilly has not made that showing. As summarized above, Mr. Reilly has challenged the overall structure of the SSA due to the allegedly unconstitutional removal restriction. He has not alleged that the ALJ was improperly appointed,[11] nor has he alleged that Commissioner Saul and/or the President took any direct action in connection with his specific case.[12] More specifically, he has not alleged how the President's alleged inability to remove the Commissioner without cause played any role in the ALJ's decision, or any other aspect of his claim.

Instead, Mr. Reilly argues that because "this case involves a structural constitutional claim implicating separation of powers concerns, an individual need not show direct prejudice and instead such harm is presumed." *See* ECF Doc. No. 14 at 12. Mr. Reilly insists that "strict causation is not required in a case like this one which involves government actors exercising power which they did not lawfully possess." *Id.*  However, courts within this circuit have previously rejected the very same argument and join a growing number of courts elsewhere that have made clear that *Collins* stands for the exact opposite proposition—i.e., plaintiffs must show that an

---

[11]     As the Commissioner explained, the ALJ who adjudicated Mr. Reilly's claim was appointed by an Acting Commissioner who enjoyed no statutory tenure protection and was removable at will. *See* ECF Doc. No. 11 at 7-8.

[12]     As it concerns the Commissioner, Mr. Reilly insists that the ALJ's decision "was in fact Commissioner Saul's own decision." *See* ECF Doc. No. 14 at 11. He does not, however, allege that the Commissioner took any specific, concrete steps in connection with his claims, nor does he allege that the President even had knowledge of the now-disputed decision or any other aspect of Mr. Reilly's claims.

unconstitutional removal provision inflicted compensable harm. *See, Etze*, 2023 WL 3689701, at *8; s*ee also Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021), *aff'd sub nom. Robinson v. Comm'r of Soc. Sec.*, No. 21-2258, 2023 WL 110553 (4th Cir. Jan. 5, 2023) ("The Plaintiff simply argues that all actions taken by the Commissioner are void due to the unconstitutional removal provision. However, *Collins* expressly rejects this view."); *Lisa Y. v. Comm'r of Soc. Sec.*, 570 F. Supp. 3d 993, 1002 (W.D. Wash. 2021) (reading *Collins* to reject the argument that an invalid removal provision rendered an agency's actions void from the outset); *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345, at *10 (M.D.N.C. July 20, 2022), *report and recommendation adopted*, No. 1:21-CV-609, 2022 WL 17832126 (M.D.N.C. Aug. 19, 2022) ("Plaintiff's actual harm argument relies on the same faulty premise as his presumed harm argument, i.e., that the unconstitutional removal provision applying to then-Commissioner Saul necessarily nullified his power to delegate authority to the ALJ (and Appeals Council judges) to make a decision in Plaintiff's case. Neither *Seila Law* nor *Collins* support that position.").[13]

In short, Mr. Reilly's constitutional claim fails because he has not shown he suffered compensable harm stemming from the Statute's alleged unconstitutionality.[14]

---

[13]     Mr. Reilly's citation to and reliance upon those cases concerning the Appointments Clause, *see* ECF Doc. 14 at 11-14, do not salvage his claim. *See, e.g., Rowe*, 2023 WL 2742747, at *3 ("For one thing, a constitutionally defective statutory removal provision does not render the Commissioner's appointment invalid, and thus it does not automatically void the ALJ's actions under the Commissioner.").

[14]     The Commissioner separately advanced several constitutional remedial doctrines in further support of his position against Mr. Reilly's request for remand. *See* ECF Doc. No 11 at 13-17) (arguing that the rehearing request should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity, and broad prudential considerations). Having found that Mr. Reilly failed to make the requisite showing of compensable harm, the Court declines to address these separate arguments.

**B.      The ALJ's Findings and Conclusions That Mr. Reilly's Disability Ceased Beginning On September 2, 2009 Are Supported By Substantial Evidence.**

Mr. Reilly's remaining challenges address several issues, including whether substantial evidence supports the ALJ's finding of medical improvement beginning September 2, 2009, and whether substantial evidence supports the ALJ's evaluation of three medical opinions. However, the common thread across each is the relevance of Mr. Reilly's three-year gap in treatment, and whether the ALJ may properly rely upon it when assessing the testimony and evidence. For this reason, the Court begins its remaining analysis by considering the circumstances in which an ALJ may properly consider a claimant's gap in treatment in connection with their assessment of the individual's subjective complaints and testimony.

On this issue, the Commissioner explains that Social Security Ruling ("SSR") 16-3p is instructive. *See* ECF Doc. No. 11 at 22.[15] Specifically, SSR 16-3p holds that an ALJ must first consider possible reasons why a claimant has not complied with a treatment regimen or otherwise sought medical assistance in a manner consistent with their reported complaints. *See* SSR 16-3p, 2017 WL 5180304, at *9. To fulfill this obligation, an ALJ may "at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints." *Id.* For example, in those circumstances where a claimant lacked medical coverage or had insufficient funds, it would be improper for the ALJ to infer from an identified gap in treatment that the claimant's symptoms are less severe than self-reported. *See, e.g., Applegate v. Colvin*, No. 4:12CV3029, 2013 WL 1222124, at *10 (D. Neb. Mar. 25, 2013) (holding remand was necessary, in part, because the ALJ's decision failed to address "explicitly whether [claimant's] poverty could

---

[15]     Although Mr. Reilly contends that SSR 16-3p "does not supplant the regulations' requirement of improvement in symptoms, signs or findings to justify a finding of medical improvement," *see* ECF Doc. No. 14 at 6, he does not dispute its relevance as to when an ALJ may properly consider a claimant's gap in treatment when evaluating their subjective complaints/testimony.

explain his failure to seek more than minimal treatment," and therefore it "was error for the ALJ to infer that [claimant's] minimal treatment undermined his credibility.").

Here, the ALJ has satisfied these requirements. During the hearing, Mr. Reilly testified at length about his reported pain and discomfort during the period in question. R.61-67. The ALJ thereafter asked Mr. Reilly why—after undergoing several years of consistent treatment, and after being awarded workers' compensation[16]—he did not have any follow up appointments for a three-year period. R.67-69. The pertinent testimony is as follows:

> Q.	[By the ALJ]: Okay. So, why did you[r] treatment stop, I mean after your worker's comp case settled, it looks like there's very little treatment, except maybe Dr. Zemble. Why did it all the sudden [sic] slow down?
>
> A.	[By Mr. Reilly]. I don't recall why, the reason why.
>
> Q.	Okay.
>
> A.	All the surgeries were done. I did I did my therapy, and that's all I can remember.
>
> Q.	All right.
>
> A.	I mean I don't really recall [the] reason why, it just the reason I can think of is I just couldn't do what I always did when I worked.
>
> Q.	Okay, but I mean you're getting a lot of treatment before your case settled, and then it settled, and then you get very little treatment.
>
> A.	Well, I guess I was only on therapy for so long. Insurance only covers it for so long.
>
> Q.	All right, thank you.

R.68-69. During that same testimony, Mr. Reilly further confirmed that he had insurance coverage through his wife's provider. R.69. The ALJ ultimately summarized this testimony in his decision and found "that the gap in [Mr. Reilly's] medical treatment from September 2009 through his date

---

[16]	In total, Mr. Reilly was awarded $450,000 in a workers' compensation settlement, but could not recall the exact year it was awarded. R.59, 69.

last insured is not explained," notwithstanding Mr. Reilly's own testimony that he had access to insurance and had secured $450,000 via a workers compensation settlement. R.33.[17]

Under comparable circumstances, courts have held that an ALJ may rely on a gap in treatment and conservative treatment when assessing whether a claimant has experienced "medical improvement" and when assessing the veracity of the claimant's allegations of pain. *See e.g., Newbold v. Colvin*, 718 F.3d 1257, 1263-65 (10th Cir. 2013) (ALJ properly relied upon, *inter alia*, a gap in treatment and conservative treatment, in concluding that claimant experienced medical improvement); *Startz v. Colvin*, No. 12 C 5240, 2014 WL 441953, at *13 (N.D. Ill. Feb. 4, 2014) ("The ALJ is not discounting Plaintiff's allegations of pain because of a general lack of treatment. Instead, the ALJ clearly states that Plaintiff's lack of consistent pain medications and gaps in treatment undermine his allegations that he is incapable of even a limited range of light work."). It is against this background that the Court assesses each of Mr. Reilly's substantive arguments.

1.    The ALJ's finding of "medical improvement" is supported by substantial evidence.

As the Supreme Court has made clear, the standard for substantial evidentiary sufficiency "is not high." *Biestek*, 139 S. Ct. at 1154. "It means–and means only–'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York.*, 305 U.S. at 229). And in applying this deferential standard of review, the Court "must not substitute [its] own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford*, 399 F.3d at 552). In other words, the Court must not re-weigh the evidence before the ALJ, but instead must assess whether substantial evidence

---

[17]    In his Reply brief, Mr. Reilly insists that the ALJ did not consider other reasons for this treatment gap, including the fact that he had restructured his activities to alleviate his pain. *See* ECF Doc. No. 14 at 7. But as made clear by the above-cited testimony, Mr. Reilly was asked about his treatment gap in several different ways and did not offer any of the now possible explanations noted in his Reply brief. In the moment, Mr. Reilly simply stated that he did not recall the reason why he discontinued treatment for such a long period of time.

supports the ALJ's findings. *See Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."). In doing so, the Court determines whether the ALJ's decision "meets the burden of articulation demanded by the courts to enable informed judicial review." *Kenyon v. Saul*, No. 1:20-CV-1372, 2021 WL 2015067, at *5 (M.D. Pa. May 19, 2021). In this regard, the ALJ need not "employ particular 'magic' words" or "adhere to a particular format in conducting his analysis." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). The Court requires— at the very least—that the ALJ "set forth the reasons for [their] decision." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

Upon review of the decision, the Court is satisfied that the ALJ has adequately forth the reasons for his findings concerning Mr. Reilly's medical improvement. To begin, Mr. Reilly is correct that once there has been a finding of disability, "the burden is on the Commissioner to prove that the claimant is no longer disabled as of the cessation date because the Plaintiff has experienced 'medical improvement." *Townsend v. Comm'r of Soc. Sec.*, No. 6:13-CV-1783-ORL-DAB, 2015 WL 777630, at *3 (M.D. Fla. Feb. 24, 2015); *see* ECF Doc. No. 10 at 11. As such, the evidence "must show that there have been changes (improvement) in the symptoms, signs or laboratory findings." 20 C.F.R. § 404.1594(c)(1). But instead of addressing the "symptoms, signs, and findings integral to a finding of medical improvement," Mr. Reilly contends that "the ALJ focused repeatedly on the 'gap in treatment' between 2009 and 2012." *See* Doc. No. 10 at 12. Of note, the court of appeals has held, the failure to seek treatment is not by itself "evidence of medical improvement." *Rice v. Chater*, 86 F.3d 1, 2–3 (1st Cir. 1996).

However, Mr. Reilly is incorrect to the extent that he suggests the ALJ singularly focused on his "gap in treatment" when finding that medical improvement had occurred. A close review of

the ALJ's decision reveals that Mr. Reilly's three-year gap in treatment was just one of several reasons in support of this finding. The ALJ noted that Mr. Reilly underwent cervical decompression in April 2009, and over the course of several weeks, there was significant improvement in his symptoms. R.27. In May 2009, Mr. Reilly's neck pain had been "significantly reduced," with "complete relief of his previous cervical radiculopathy." R.1169.[18] At his six-week follow up appointment in June 2009, there was no cervical radiculopathy, and Mr. Reilly was "overall quite pleased with the results." R.27 (referring to Ex.18F). Again, in September 2009, Mr. Reilly reported "improved symptoms," and was found to be neurologically intact on examination. R.32 (referring to Ex.18F at R.1158).[19]

Only *after* analyzing these changes in Mr. Reilly's symptoms did the ALJ address that there was a gap in treatment until a 2012 MRI of his lumbar spine,[20] and only then did the ALJ observe that Mr. Reilly had no explanation as to why. R.32. Absent any explanation, the ALJ reasonably found this treatment gap to be inconsistent with the severity of Mr. Reilly's allegations for that time period. As such, the ALJ's analysis is supported by more than a "mere scintilla of

---

[18]     Specifically, Dr. James. S. Harrop, M.D. wrote a letter dated May 21, 2009 addressed to Dr. Herbert Zemble, M.D., where he reported having seen Mr. Reilly for a neurological spine evaluation and follow-up. In this letter, Dr. Harrop explained that Mr. Reilly has had a significant reduction in neck pain and experienced "complete relief of his previous cervical radiculopathy." R.1169. Dr. Harrop further noted that Mr. Reilly was "quite happy with his results at this time. R.1169.

[19]     Again, Dr. Harrop wrote a letter dated September 3, 2009 addressed to Dr. Zemble where he reported that Mr. Reilly "has improved symptoms from originally which we discussed was a 10/10 down to approximately a 4/10." R.1158. Yet, Mr. Reilly insists that that "ALJ's reliance on Dr. Harrop's September 3, 2009 notes is misplaced," because he contends that the ALJ ignored Dr. Harrop's other statements, which "question[ed] whether he will be able to return back to any sort of manual labor." *See* ECF Doc. No. 14 at 3-4. Specifically, he argues that Dr. Harrop also reported that Mr. Reilly's pain levels vary with the day and amount of intensity, and yet the ALJ failed to mention and/or consider these complaints. *Id.* (quoting R.1158). However, a close review of the disputed decision demonstrates that the ALJ explicitly noted that "Claimant reported [to his neurosurgeon in September 2009] that his pain leveled [sic] varied with the day and the amount of intensity and activity . . ." R.32 (citing R.1158). However, the ALJ further explained that Dr. Harrop's letter also revealed that Mr. Reilly "was neurologically intact on examination." *Id.* It is therefore inaccurate to suggest, as Mr. Reilly does, that the ALJ selectively ignored the evidence.

[20]     The ALJ explained that while the MRI revealed multilevel disc degeneration, disc bulging, and facet hypertrophy, it showed no evidence of complications. R.32 (referring to Exhibit 18F at 1127-28).

evidence," and the Court declines any invitation to re-assess the evidence and/or impose its own factual determinations. *See Chandler.*, 667 F.3d at 359.

2.   <u>The ALJ's evaluation of the medical opinion evidence is supported by substantial evidence.</u>

Mr. Reilly next challenges the ALJ's evaluation of the medical opinions offered by Dr. Haque, Dr. Wetzel, and Dr. Valentino. For the reasons that follow, the Court again declines any invitation to re-assess the evidence and impose its own factual determinations.

a.   *Khwaja Mujib Haque, M.D*

At the request of the prior ALJ, the record was reviewed by Khwaja Mujib Haque, M.D., a medical expert who is Board certified in internal medicine. R.1277-85. Dr. Haque was asked by the ALJ to provide his opinion as to Mr. Reilly's RFC between February 1, 2007 through June 30, 2011. R.1278. In reviewing this opinion, the ALJ found the limitations noted by Dr. Haque between February 20, 2007 and September 1, 2009 were "appropriate" and "generally consistent" with his earlier RFC analysis, a position that Mr. Reilly does not contest. R.29. However, and as explained by the ALJ, "Dr. Haque also noted [a] gap in treatment, indicating that he needed corroborating evidence such as a recent MRI and supporting statement from claimant's treating surgeon." R.29 (citing Exhibit 23F). Given this, the ALJ only gave the opinion "some weight," particularly for the period after September 1, 2009 where Dr. Haque acknowledged the gap in treatment. R.29.

Mr. Reilly nevertheless contends "there was no good reason for the ALJ to reject Dr. Haque's opinion for the 2009-11 period." *See* ECF Doc. No. 10 at 15. Specifically, Mr. Reilly argues that "[w]hile Dr. Haque stated that 'a recent MRI of the spine and assessment by the treating surgeon Dr. Wetzel is recommended,' both of those are in the record and corroborate Dr. Haque's opinion that Plaintiff was limited to no more than sedentary work during the entire period at issue."

*Id.* (quoting R.1284). Mr. Reilly thereafter recited select portions of his 2012 MRI, arguing that "the very evidence Dr. Haque sought to confirm his opinion was actually present in the record before the ALJ," and yet the "ALJ disregarded this fact, and instead relied on his view that Dr. Haque 'acknowledged the gap in treatment after 2009.'" *Id.* (quoting R.29).

But these contentions are unconvincing, and it is not the ALJ's responsibility to assume or to guess what Dr. Haque *might* have concluded had he reviewed certain pieces evidence that Mr. Reilly now contends support his position.[21] Instead, the ALJ independently analyzed Mr. Reilly's 2012 MRI report and concluded that it showed no evidence of complications. R.32 (referring to Exhibit 18F at 1127-28). The ALJ also observed that Mr. Reilly failed to seek treatment for several years and had no explanation as to why. R. 32-33. Indeed, the ALJ noted that Dr. Haque explicitly acknowledged this gap in treatment. R.29. Moreover, the ALJ explored this issue during the hearing, and determined that Mr. Reilly's self-reported symptoms were inconsistent with the evidence. As such, Dr. Haque's opinion was only given some weight. R.29.

While Mr. Reilly may be unsatisfied with this conclusion, it is inaccurate to suggest, as he does now, that there was "no good reason" to reject the limitations noted by Dr. Haque after September 2009, or that the analysis was "fundamentally flawed." The ALJ adequately explained his finding, and the Court will not re-assess the evidence to reach a contrary conclusion.

    b.    *Steven J. Valentino, D.O. and F. Todd Wetzel, M.D.*

Finally, Mr. Reilly contends that the ALJ erroneously assigned little weight to the opinions of his treating orthopedic surgeon, F. Todd Wetzel, M.D., and Steven, J. Valentino, another Board-

---

[21]    Mr. Reilly acknowledged that "Dr. Haque overlooked the 2012 MRI reports," and conceded that there is no apparent explanation as to why. *See* ECF Doc. No. 10 at 16, fn. 7 (citing R.1278). Indeed, Mr. Reilly further acknowledged that Dr. Haque "did not address the September 28, 2016 opinion of Dr. Wetzel," suggesting that "it may have been that Dr. Haque was not provided with Dr. Wetzel's opinion when the record was sent to him on October 8, 2016. *Id*. (citing R.1277). But Mr. Reilly's suggestion is wholly speculative and unsupported by the record.

certified orthopedic surgeon. *See* ECF Doc. No. 10 at 17-21. In reviewing each, the ALJ first found Dr. Valentino's opinion to be of "little probative value" because it "makes no mention of the gap in records from September 2009 through the medical note of September 2012," and otherwise "articulates no basis for concluding that claimant remained disabled from September 2009 through his date last insured." R.29. The ALJ further observed that Dr. Wetzel did not conduct "any additional independent analysis" but simply adopted the findings of Dr. Valentino via a "generic checkbox form." R.29.

According to Mr. Reilly, "it is an error of law to reject the treating physician's opinion without an adequate explanation," and that it "cannot be rejected where there is no contrary medical evidence." *Id.* at 17 (citing *Wallace v. Sec'y of HHS*, 722 F.2d 1150, 1155 (3d Cir. 1983); *Johnson v. Bowen*, 699 F.Supp. 475, 482-83 (E.D. Pa. 1988); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)). Citing to SSA regulations, Mr. Reilly emphasizes that "where the 'treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it *controlling weight*.'" *Id.* at 18 (quoting 20 C.F.R. §404.1527(c)(2)) (emphasis in original). Indeed, according to Mr. Reilly, "Dr. Valentino and Dr. Wetzel understood that the nature and severity of the impairments suffered by Mr. Reilly . . . would continue to cause severe pain and limitations after 2009 precluding all but sedentary exertion." *Id.* at 21. Mr. Reilly argues that, notwithstanding all this, the ALJ improperly assigned "little weight" to each opinion, emphasizing once more that the ALJ's reliance on his "gap in records" is misplaced. *Id.* at 20.

The Court is not convinced. Mr. Reilly is correct that treating physicians' reports should be accorded great weight, particularly where the opinions reflect "expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). However, an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). Here, there is no dispute that Dr. Valentino was *not* Mr. Reilly's treating physician, and his opinion was formed through a second-hand review of medical records in 2016—not through "continuing observation" of Mr. Reilly or his symptoms. As such, his opinion is not entitled to any presumption of greater weight, and as explained by the ALJ, Dr. Valentino's failure to address or otherwise consider Mr. Reilly's gap in treatment limits its overall probative value. R.29.

Having concluded that Dr. Valentino's opinion would be assigned "little weight," the ALJ appropriately determined that the opinion of Dr. Wetzel would also be of limited evidentiary value. Although he once served as Mr. Reilly's actual treating physician, Dr. Wetzel did not treat Mr. Reilly for several years following his surgery in 2008, and more significantly, did not provide an independent explanation in support of his conclusions. Rather, Dr. Wetzel was broadly asked if he agreed with Dr. Valentino's findings, to which he indicated "yes" through a generic checkbox form. R.29, 1276. Absent any supporting explanation, the ALJ was entitled to assign his opinion less weight. *See Plummer*, 186. F.3d at 429; *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Zonak v. Commissioner of Social Security*, 290 F. App'x. 493, 497 (3rd Cir. 2008) (finding that ALJ did not err when rejecting a treating physician's opinion because the

"opinion at issue was provided on a check-box form and no reasons were given in support of [the physician's] conclusion that [the claimant] was unable to work."); *Temple v. Saul*, No. CV 19-19243 (FLW), 2020 WL 5627001, at *6 (D.N.J. Aug. 18, 2020) (noting that the physician "completed nothing more than a check-box evaluation, which is weak evidence.").

This Court finds that ALJ adequately explained his evaluation of Dr. Valentino's and Dr. Wetzel's opinions, and the Court will not re-assess the evidence to reach a contrary conclusion.[22]

## IV.    CONCLUSION

For the reasons explained above, Mr. Reilly's request for review is **DENIED**. The Court finds that the ALJ's decision was ultimately supported by substantial evidence. As such, the final decision of the Commissioner of Social Security is **AFFIRMED,** and this matter is **DISMISSED.** An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge

---

[22]    Having found that the ALJ properly evaluated the medical opinions of Dr. Valentino, Dr. Wetzel, and Dr. Haque, the Court also rejects Mr. Reilly's final argument concerning the hypothetical given to the vocational expert. According to Mr. Reilly, the ALJ committed reversible error when he failed to include those limitations identified by each doctor. *See* ECF Doc. No. 10 at 21-24. But this challenge appears to be nothing more than an extension of his earlier arguments, which have already been rejected, and Mr. Reilly has not articulated any new or independent basis to disturb the ALJ's decision. In short, the ALJ was permitted to rely upon the testimony of the vocational expert because said testimony "was in response to a hypothetical that fairly set forth every credible limitation set forth by the physical evidence." *Plummer*, 186 F.3d at 431.